IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDON DUCK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 3:24-cv-222-ECM |
| | ) | [WO] |
| PNC BANK, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Defendant, PNC Bank, moves for summary judgment as to Plaintiffs' claims. (Doc. 67). Plaintiffs, Brandon Duck and the estate of Tommy Duck, oppose that motion. (Doc. 72). The Magistrate Judge recommends that the Court grant Defendant's motion, (doc. 74), and Plaintiffs timely objected, (doc. 77). Upon consideration, Plaintiffs' objections are due to be overruled, the Magistrate Judge's recommendation adopted as modified herein, and Defendant's motion granted.

### I.  BACKGROUND

Plaintiffs are Brandon Duck and the estate of his deceased father, Tommy Duck.[1] (Doc. 1-2 at 7). Before he died, Tommy opened a checking account and two certificate of deposit accounts with Defendant, each of which contained payable on death ("POD")

---

[1] Because this case involves three Ducks—Brandon, Tommy, and Sue—the Court refers to them by their first names to avoid clutter. Also, although Sue is occasionally referred to as Glenda in the record, (*see, e.g.*, doc. 67-1 at 4, para. 7), the Court addresses her as Sue because that is her preferred name, (*see* doc. 67-2 at 3).

designations. (Doc. 67-1 at 8, 41–44).  He named Sue Duck—his wife—and Brandon as the beneficiaries on those accounts. (*Id.* at 2–3, paras. 3, 5).

Tommy passed away on March 7, 2022. (*Id.* at 83).  On March 18, 2022, Sue went to Defendant's Dadeville, Alabama branch to close out Tommy's accounts. (*Id.* at 4, para. 7; doc. 67-2 at 5).  She brought copies of Tommy's death certificate, will, and the couple's marriage license with her, as she had called ahead and been told those were the documents she would need to close out the accounts. (Doc. 67-2 at 5).  Defendant's records show that the teller who assisted Sue recorded Tommy's death in its system. (Doc. 67-1 at 85). Because Brandon was not present, and because Sue did not have a letter from him authorizing her to close out the accounts in his absence, the teller issued Sue two checks for the total amount contained in all three accounts. (*Id.* at 5, para. 15).  However, those checks contained an error; Sue's name was "stacked" on top of Brandon's "instead of separated with the word 'and' as the POD Procedures require." (*Id.* at 5, para. 16; *see id.* at 87–88; doc. 69-1 at 8–9 (the POD procedures, filed under seal)).  So the teller reprinted the checks and made them payable to "GLENDA HOLDRIDGE DUCK AND BRANDON G DUCK." (Doc. 67-1 at 90–91).  Once she had the checks, Sue went to Wells Fargo, where she banks, to deposit them. (Doc. 67-2 at 6).  But because the checks were made out to her and Brandon both, she was told that Brandon would need to endorse the checks for her to negotiate them. (*See id.* at 6–7; *see also* doc. 67-1 at 5, para. 19–20; doc. 69-1 at 9). Sue called Brandon, asked him to come and endorse the checks, and he did. (Doc. 67-2 at 6–7).

Brandon largely does not dispute this account, though in his telling Sue falsely indicated that all the money was hers and that Brandon's name was only on the checks "in case something happened to her and [Tommy] simultaneously." (Doc. 67-3 at 10).  In any event, and for whatever reason, Brandon endorsed the checks. (*Id.* at 11).  Brandon later shared all of this with his attorney, who—discerning something fishy—instructed him to go to Defendant's Dadeville branch to see what he could learn. (*See id.* at 11–12).  Brandon did.  According to him, the manager he spoke to seemed to indicate that something was amiss—though she didn't say what.

> We [(Brandon and his sister, Alison Adcock)] went in there and was talking to the manager about this, and I showed her copies and explained to her what was going on. And she said that, well, this is a teller check from some girl out there, you know, in the main part of the bank. She said, "This is a teller check. This is not an account closing or a beneficiary check at all. This shouldn't—something's not right."
>
> You know, then we got to looking into it, or she did, and I questioned her about the account and—well, she wouldn't let me see anything that she was looking at. And I asked—I was like, "Well, doesn't that have my name on it?" And she said, "Yes, it does." I said, "Well, let me see it." She said . . . , "No, I can't let you see this." And she said, "This conversation is over. I'll have to ask you to leave now." And that's from the manager at PNC Bank there when I started questioning about the—my dad's accounts.

(*Id.* at 12).

Brandon then brought an action against Sue, who Brandon claims took the money and ran. (*Id.* at 17–18).  However, he voluntarily dismissed that lawsuit. (*Id.*).  Along the way, Brandon determined that Defendant was to blame for this situation, as it "enabled [Sue] to do what she did." (*Id.* at 18).  Accordingly, Brandon filed this lawsuit on his own

behalf and on behalf of Tommy's estate asserting five causes of action: breach of contract, breach of fiduciary duty, negligence, wantonness, and conversion. (Doc. 1-2 at 9–11, paras. 19–46).   He and Tommy's estate sought compensatory damages and, related to the wantonness and conversion claims, punitive damages. (*See id.*).

Defendant moves for summary judgment as to all five claims, arguing that each fails as a matter of law. (Doc. 67).  Plaintiffs do not entirely disagree.  In their response, they "candidly acknowledge that not all claims pled in the [c]omplaint survive summary judgment under Alabama law." (Doc. 72 at 4).  Accordingly, they stipulated to entry of summary judgment on their breach of fiduciary duty, negligence, wantonness, and conversion claims, leaving only their breach of contract claims. (*Id.* at 4–5; *see* doc. 74 at 10–11).  The Magistrate Judge entered a report and recommendation, recommending that the Court grant Defendant's motion for summary judgment as to all of Plaintiffs' claims. (Doc. 74).  Plaintiffs timely objected to the recommendation, (doc. 77), which Defendant opposes, (doc. 78).

On March 26, 2026, the Court entered an order to show cause, noting its concern that it lacks jurisdiction. (Doc. 79).  The Court ordered the parties to brief that issue, which they have now done. (Docs. 80, 81, 83).  Upon review, the Court is satisfied that it has jurisdiction over this matter.   The Court also finds that the Magistrate Judge's recommendation is due to be adopted as modified herein.  Accordingly, the Court grants Defendant's motion for summary judgment.

4

## II.  LEGAL STANDARDS

### A.    Subject Matter Jurisdiction

The Court "is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999); *see Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) ("Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt.").  Generally, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014).  However, "when the plaintiff contests, or the court questions, the defendant's allegation," then the Court must find by the preponderance of the evidence that the amount in controversy exceeds the jurisdictional threshold. *Id.* at 88–89.  The defendant, as the removing party, bears this burden. *Dudley v. Eli Lilly & Co.*, 778 F.3d 909, 913 (11th Cir. 2014).

### B.    Motion for Summary Judgment

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials" when resolving the motion. FED. R. CIV. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817

(11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted)).[2]

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant shows that no evidence supports the non-moving party's case, the burden then shifts to the non-moving party to show that there are, in fact, genuine factual disputes precluding judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

## C.    Standing

"[S]tanding is a necessary component of [a federal court's] jurisdiction to hear 'cases' and 'controversies' under Article III of the Constitution." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1190 (11th Cir. 2009) (citing *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1169 (11th Cir. 2006)). The party invoking federal jurisdiction bears the burden of establishing the constitutional requirements for standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, the plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the

---

[2] Here and elsewhere the Court cites nonbinding authority. While the Court recognizes that these cases are not precedential, the Court finds them persuasive.

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

### III. DISCUSSION

The Court first explains that, in light of the parties' submissions, the amount in controversy requirement is satisfied. The Court then turns to the substance of Defendant's motion for summary judgment. Because the Court agrees with the Magistrate Judge that Plaintiffs' breach of contract claims—the only claims Plaintiffs persist in—fail as a matter of law, the Court grants Defendant's motion.

### A.    Subject Matter Jurisdiction

There are two requirements to invoke a federal court's diversity jurisdiction. First, the parties must be completely diverse. Second, the amount in controversy must exceed the $75,000 jurisdictional threshold. 28 U.S.C. § 1332(a). Here, the only point of contention is whether the amount in controversy requirement is satisfied. In response to the Court's order to show cause, Defendant argues that the amount in controversy requirement is satisfied for two reasons. First, Plaintiffs challenge the manner in which Defendant closed the accounts in question, which Defendant argues places the full amount contained in those accounts—$122,410.16—into controversy. (Doc. 81 at 4). Second, Plaintiffs initially sought to recover emotional distress and punitive damages, which they valued during discovery in excess of half a million dollars. (*Id.* at 4–5).

Defendant is correct that the central dispute in this case is whether it properly closed out Tommy's accounts. After all, the complaint says that "Defendants[3] improperly paid out funds from the . . . accounts to the wrong . . . person." (Doc. 1-2 at 8, para. 11). However, the complaint also clearly states that the only harm Plaintiffs suffered was that these funds were paid to "only one beneficiary and not to" Brandon. (*Id.*). That's why the complaint says that Brandon was "deprived of his *share* of the accounts in question." (*Id.* at 8, para. 16 (emphasis added); *see* doc. 80 at 3 ("Plaintiffs' position—consistent with the record—is that Brandon Duck's interest is limited to approximately one-half of the account funds, or roughly $60,000."); doc. 83-1 at 10 ("[Defendant] has deprived me [(Brandon)] of one-half of the sum of money in my father's account which amounts to $61,205.08.")). The amount in controversy does not include the other half of the money that was in the accounts because that amount was simply never in controversy. *See Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 751 (11th Cir. 2010) ("The amount in controversy . . . is an estimate of the amount that will be put at issue in the course of the litigation." (quotation omitted)).

However, Plaintiffs also sought punitive and emotional distress damages for their wantonness and conversion claims. (*See* doc. 1-2 at 11, paras. 40–41, 46). And as Defendant notes, those claims could support these awards. *See* ALA. CODE § 6-11-20(b)(3)

---

[3] Plaintiffs sued several fictitious defendants in addition to PNC Bank. (Doc. 1-2 at 7). Plaintiffs have apparently abandoned any claims it thought it might have had against those defendants, as they do not reference those defendants in any of the filings now before the Court. (*See, e.g.*, doc. 72 (listing only PNC Bank as a Defendant in the case caption)). In any event, "fictitious-party pleading is not permitted in federal court," *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010), so the Court disregards these defendants.

(wantonness); *Liberty Nat'l Life Ins. Co. v. Caddell*, 701 So. 2d 1132, 1136 (Ala. Civ. App. 1997) (conversion).  It's true, as Plaintiffs argue, that "an allegation of punitive damages does not amount to a *de facto* satisfaction of the amount in controversy, as 'there is nothing talismanic about such a demand that would *per se* satisfy the amount[ ]in[ ]controversy requirement and trigger federal subject[ ]matter jurisdiction.'" *Davis v. Burlington Coat Factory Warehouse Corp.*, 2025 WL 2940713, at *1 (S.D. Ga. 2025) (quoting *Rachel v. PNC Bank, NA*, 2017 WL 1362034, at *10 (S.D. Ala. 2017)).  But Plaintiffs are hard-pressed to dispute the value of these claims when they attached six-figure sums to them. In response to Defendant's interrogatory, asking Brandon to describe his non-economic losses, he stated the following:

> [T]he emotional anguish and stress brought on me by PNC depriving me of this money has caused me to suffer great digestive issues as [a] result.  I have expressed anxiety.  My personal relationships have suffered.  I have been highly upset and hurt.  A jury should determine how much all this is worth but if you ask me, it's worth $500,000.00.

(Doc. 83-1 at 10).  A similar valuation was endorsed by Plaintiffs' attorney in his Rule 26(a) disclosures.

> The Plaintiff, Brandon Duck, is seeking punitive damages in the amount equal to or in excess of ten (10) times the amount of compensatory damages. . . . The Plaintiff, Brandon Duck, is seeking damages on the basis of the digestive problems [he] experienced . . . , which was a result of this current matter.  The Plaintiff, Brandon Duck, was treated by Dr. Derek K. Holcombe, a gastroenterologist[,] for the digestive problems he experienced as a result [of] this matter.

(Doc. 83-2 at 2).

Plaintiffs do not contest these valuations. Instead, they argue that, because they have conceded the only claims that could support awards of exemplary or emotional damages, the amount in controversy is now below the jurisdictional threshold. (Doc. 80 at 4). But the amount in controversy is fixed at the moment of removal. *See Pretka*, 608 F.3d at 751 ("A court's analysis of the amount-in-controversy requirement focuses on how much is in controversy at the time of removal, not later."). So the fact that Plaintiffs have conceded certain claims since removal is irrelevant. The Supreme Court said as much eighty-eight years ago.

> [E]vents occurring subsequent to removal which reduce the amount recoverable, whether beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached. . . . If the plaintiff could, no matter how bona fide his original claim in the state court, reduce the amount of his demand to defeat federal jurisdiction the defendant's supposed statutory right of removal would be subject to the plaintiff's caprice. The claim, whether well or ill found in fact, fixes the right of the defendant to remove, and the plaintiff ought not to be able to defeat that right and bring the cause back to the state court at his election.

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 293–94 (1938).

When Defendant removed, Plaintiff sought $61,205.08 in compensatory damages, and ten times as much in punitive damages. Accordingly, the Court has little difficulty concluding that the amount in controversy was satisfied at the time of removal. The Court therefore has subject matter jurisdiction over this case. *See* 28 U.S.C. § 1332.

**B.     Motion for Summary Judgment**

At the outset, the Court addresses Defendant's argument that Brandon lacked standing to sue on behalf of Tommy's estate when he initiated this action, (doc. 67 at 11–

12), and the Magistrate Judge's conclusion that the estate lacks standing to bring the breach of contract claim at all, (doc. 74 at 11–15). Ultimately, the Court finds that both Plaintiffs have standing. However, because the Court agrees with the Magistrate Judge that the breach of contract claim fails as a matter of law, the Court largely adopts the recommendation and grants Defendant's motion for summary judgment on that basis.[4]

### 1.   Standing

Defendant argues that it is entitled to summary judgment on all the claims brought on behalf of Tommy's estate because Brandon was not appointed administrator of the estate until October 3, 2025, and therefore lacked standing to sue on Tommy's behalf when he filed the complaint on March 15, 2024. (*Id.* at 11). The Court agrees with Defendant that standing is a threshold issue that the Court must consider before reaching the merits. *See Wiand v. ATC Brokers LTD.*, 96 F.4th 1303, 1311 (11th Cir. 2024). Likewise, it appears undisputed that, although Brandon is now the administrator of Tommy's estate, he was not when the lawsuit was filed. (*See* doc. 72 at 10). But this issue does not concern standing; instead, it goes only to Brandon's capacity to bring the claim on behalf of Tommy's estate, that is, whether Brandon is the "real party in interest" in this lawsuit. *See Est. of Reed v. Ponder Enters., Inc.*, 2012 WL 1031487, at *4 (M.D. Ala. 2012) ("Contrary to the

---

[4] Defendant also argued that the Uniform Commercial Code preempts or displaces Plaintiffs' breach of contract claims. (Doc. 67 at 14–15). The Magistrate Judge disagreed, concluding that the UCC did not bar the claims. (Doc. 74 at 17–19). Defendant did not object to this determination, and Plaintiffs only objected on the mistaken notion that the Magistrate Judge had reached the opposite conclusion. (*See* doc. 77 at 11 ("[T]he Recommendation errs in concluding that the UCC necessarily forecloses Plaintiffs' breach-of-contract theory.")). Because neither party objects to the Magistrate Judge's actual conclusion on this point, and because Plaintiffs' claims fail for another reason, the Court does not address Defendant's UCC arguments further.

[d]efendants' assertions, the [e]state's ability to assert the claims in the amended complaint is not a question of standing, but of capacity."); *Global Aerospace, Inc. v. Platinum Jet Mgmt., LLC*, 2011 WL 248543, at *6 (S.D. Fla. 2011) ("Though the notio[n] of real party in interest closely resembles standing in that 'both terms are used to designate a plaintiff who possesses a sufficient interest in the action to be entitled to be heard on the merits, other elements of the standing doctrine are clearly unrelated to Rule 17(a).'" (alterations adopted) (quoting 6A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1542 (2009))).

Whether a suit is properly brought in the name of the real party in interest is a procedural defect that can be remedied. *See* FED. R. CIV. P. 17(c) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest."). Brandon argues that "any technical defect was cured upon [his] appointment," (doc. 72 at 10), which served to "ratif[y] the litigation," (doc. 77 at 5). The Court agrees. Defendant does not dispute that Brandon is now the executor of Tommy's estate, nor does it argue that Tommy's estate has not ratified this lawsuit. (*See* doc. 73 at 1–2; doc. 78 at 3). Accordingly, the Court finds that the estate has ratified this lawsuit—Brandon was officially appointed executor of Tommy's estate on October 3, 2025, (doc. 67-6), and has continued to litigate on behalf of the estate thereafter, responding to Defendant's dispositive motion, (doc. 72), the Magistrate Judge's recommendation, (doc. 77), and the

12

Court's order to show cause, (doc. 80). *Cf. Hess v. Eddy*, 689 F.2d 977, 980 (11th Cir. 1982) ("The plain language of the Rule clearly provides that when an action is brought by someone other than the real party in interest within the limitations period, and the real party in interest joins or ratifies the action after the limitations period has run, the amendment or ratification relates back to the time suit was originally filed and the action need not be dismissed as time barred.").[5]

In the recommendation, the Magistrate Judge determined that the estate lacked standing to bring a breach of contract claim at all. (Doc. 74 at 11–15). The Magistrate Judge reasoned that, because Plaintiffs failed to adduce any evidence that "PNC failed to follow internal procedures and documentation requirements regarding the closure of the POD accounts," the estate was not injured and therefore lacks standing to sue. (*Id.* at 13–14). While the Magistrate Judge accepted that "had PNC failed to honor Tommy's wishes, violated the law, or mishandled the assets while closing the accounts, the [e]state may have a right to sue PNC for breach of some legal duty," she concluded that Defendant "fulfill[ed] Tommy's intent to convey the proceeds from his POD accounts to his two beneficiaries," and that Plaintiffs' "version of the facts . . . misconstrues what happened" based on the record evidence. (*Id.*).

---

[5] While Plaintiffs argue that Brandon's subsequent appointment as executor of the estate relates back to the original filing of the lawsuit, relation back would only appear necessary if the estate's breach of contract claim would otherwise be time barred—that is, if the limitations period had run after the lawsuit was brought but before Brandon was appointed. But that doesn't seem to be the case. The statute of limitations period for breach of contract claims in Alabama is six years. *See* ALA. CODE § 6-2-34. That period "runs from the time a breach occurs." *Hackleburg Church of Christ v. Great Am. Ins. Cos.*, 675 So. 2d 1309, 1311 (Ala. Civ. App. 1995). Here, the alleged breach occurred on March 18, 2022, so the estate's breach claim—whether it was properly brought when this suit was filed in 2024 or when Brandon ratified the suit on the estate's behalf in 2025—is timely.

However, the merits of the estate's breach of contract claim do not implicate Article III standing. It's true that the elements of standing are "not mere pleading requirements" and that "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan*, 504 U.S. at 561. But a plaintiff's failure on the merits does not operate to deprive him of standing—nor could it, as standing "must be addressed prior to and independent of the merits of a party's claims." *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1279 (11th Cir. 2017) (quotation omitted); *see Warth v. Seldin*, 422 U.S. 490, 500 (1975) (explaining that "standing in no way depends on the merits of the plaintiff's" claim). Overlapping though they might be, standing to bring a claim and the ability to succeed on that claim are distinct. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) ("[O]ne must not confuse weakness on the merits with absence of Article III standing." (alteration adopted) (quotation omitted)). Otherwise "a plaintiff who ultimately loses on the merits (and by definition did not have a substantive right to relief) would never have had standing to pursue his or her claims in the first place," a rule that would "allow a merits decision to swallow the antecedent matter of standing." *Romano v. John Hancock Life Ins. Co. (USA)*, 120 F.4th 729, 738 (11th Cir. 2024) (quotation omitted).

Both Plaintiffs have standing to sue Defendant for breach of contract. Whether Plaintiffs have adduced sufficient evidence to survive summary judgment is a different question. Not to bury the lede, they have not.

## 2.    Breach of Contract[6]

Plaintiffs argue that the account agreements Tommy signed imposed obligations concerning how the accounts were to be closed and the funds distributed, and that Defendant—somehow, some way—failed to adhere to those obligations. (Doc. 72 at 14–15).  Defendant (supported by the record) disagrees. (Doc. 67 at 16–17).

"The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff['s] performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105 (Ala. 2002).  "The party asserting a breach-of-contract claim must prove *every* element of that claim; the failure to prove any one element necessarily results in a judgment for the opposing party." *Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 491 (Ala. 2020) (emphasis in original).

The Court agrees with the Magistrate Judge that Plaintiffs have not "produce[d] sufficient evidence of PNC's nonperformance under th[e] contracts." (Doc. 74 at 21).  The agreement corresponding to Tommy's checking account provided as follows:

> **Payable-On-Death or "In Trust For" Accounts**
>
> We [(PNC Bank)] will, as permitted by law, accept accounts that are designated as either payable on death or in trust for another (both referred to as "POD Account(s)"), which automatically transfer your POD Account, upon your death, to the beneficiaries ("POD Beneficiaries") designated on the signature card. This means that when you die the funds in a POD Account will not be part of your estate.

---

[6] Two quick prefatory notes.  The Magistrate Judge determined that Brandon was a third-party beneficiary to the account agreements and was therefore entitled to bring a breach of contract claim as to those agreements. (Doc. 74 at 20).  The Magistrate Judge also analyzed the breach claim under Alabama law. (*Id.* at 19).  Neither party objects to these determinations and the Court finds no error in them.

(Doc. 67-1 at 18). The account agreement for the certificates of deposit contained a functionally identical provision.

> **Payable-On-Death or In Trust For CD[]s . . . and Money Market Accounts**
>
> PNC Bank will, as permitted by law, accept CD[]s or Accounts that are designated as either payable on death or in trust for another (both referred to as "POD Account(s)"), which automatically transfer your POD Account, upon your death, to the beneficiaries ("POD Beneficiaries") designated on the CD or Account. This means that when you die the funds in a POD CD or Account will not be part of your estate.

(*Id.* at 53; *see id.* at 3, paras. 4, 6). The plain language of these provisions simply required Defendant to transfer the funds in Tommy's accounts to Sue and Brandon when Tommy died. (Doc. 67 at 17). And Defendant's internal policies only required Defendant to issue a check "payable to all beneficiaries" with "the word **and** between each beneficiary's name in the Payee field." (Doc. 69-1 at 9 (emphasis in original)).[7] The undisputed record evidence shows that Defendant discharged those obligations. (*See* doc. 67-1 at 5, 90–91; doc. 67-3 at 5–6).

Plaintiffs' objections do not meaningfully confront the Magistrate Judge's recommendation. They argue that the recommendation "improperly resolves factual

---

[7] It does not appear that Defendant's procedures were incorporated into the account agreements such that violation of them would constitute a breach of the account agreements. Nevertheless, Plaintiffs argue (without explanation) that the account "agreements impose[d] obligations" on Defendant, and that whether Defendant complied with those obligations depends on, among other things, "adherence to internal procedures." (Doc. 72 at 14; *see id.* ("Plaintiffs have also presented evidence from which a reasonable jury could conclude that PNC's alleged failure to follow its own procedures and representations caused the loss at issue.")). The Court disagrees but, in any event, the record clearly demonstrates that Defendant closed out the accounts in accordance with its internal policies and procedures.

disputes regarding the handling of the checks," suggesting that "the record contains evidence suggesting that PNC's employees *may have* issued the checks in a manner inconsistent with its own procedures." (Doc. 77 at 8 (emphasis added)).  Though Plaintiffs offer no citations to the record in support of these contentions,[8] the undersigned assumes that Plaintiffs are referring to Brandon's deposition testimony that an unnamed employee at Defendant's Dadeville branch said an undisclosed something was "not right" about the closure of Tommy's accounts. (Doc. 67-3 at 12; *see* doc. 67-4 at 8 (Alison Adcock's deposition testimony that she believed the manager at the Dadeville branch "said th[e checks] shouldn't have been issued by a teller, but I'm not a hundred percent")).  But Defendant has supplied the Court with the underlying account agreements and Defendant's internal procedures for closing out accounts with POD designations, and the manner in which Defendant closed out Tommy's accounts comports with each of them. (Docs. 67-1 at 18, 53; doc. 69-1 at 9).  Brandon's vague testimony that *something* was amiss is insufficient to create a genuine dispute of material fact—especially because, under Alabama law, the party asserting a breach of contract must identify a *material* breach of the contract. *See Abernant Fire Dep't v. Rhodes*, 21 So. 3d 739, 744 (Ala. Civ. App. 2009); *Stockton v. CKPD Dev. Co.*, 936 So. 2d 1065, 1078 (Ala. Civ. App. 2005) ("A material breach of a contract is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract." (quoting *Sokol v. Bruno's, Inc.*, 527 So. 2d 1245, 1248 (Ala. 1988))).

---

[8] Which furnishes an independent basis to overrule their objections. *See Wells v. Cohen*, 2023 WL 5353350, at *1 (M.D. Ala. 2023) ("[C]onclusory and unsupported objections . . . are simply insufficient.").

When Tommy died, Defendant closed out his accounts and issued checks payable to both Sue and Brandon, and that was all it was required to do.  Accordingly, a reasonable jury could not return a verdict for Plaintiffs based on the record evidence, so Defendant is entitled to summary judgment. *Anderson*, 477 U.S. at 248.[9]

## IV.  CONCLUSION

Accordingly, it is

ORDERED as follows:

1.      Plaintiffs' objections (doc. 77) are OVERRULED.

2.      The recommendation of the Magistrate Judge (doc. 74) is ADOPTED as modified herein.

3.      Defendant's motion for summary judgment (doc. 67) is GRANTED.

4.      All pending motions are DENIED as moot, and all pending deadlines are TERMINATED.

5.      This case is DISMISSED with prejudice.  A separate final judgment will be entered.

---

[9] The Magistrate Judge also recommends granting summary judgment on the breach of contract claims in light of Alabama's Uniform Multiple-Persons Account Act, ALA. CODE §§ 5-24-1 to 5-24-34, which "discharge[s] . . . financial institution[s] from all claims" for amounts paid out from certain accounts "pursuant to this chapter in accordance with the type of account," *id.* § 5-24-26(a).  Not only is this language broad, but it appears that Defendant did comport with the section covering POD accounts. *See id.* § 5-24-23 & cmt. ("A financial institution that makes payment on proper request under this section is protected unless the financial institution has received written notice not to.").  Plaintiffs have not proffered any controlling authority to the contrary. (*See* doc. 77 at 7–8).  Indeed, the one citation they provide appears to undermine their argument. *See Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 495 (Ala. 2020) (Mendheim, J., concurring in the judgment) ("[Section] 5-24-26(a) makes it clear that the financial institution is not liable for 'payment made pursuant to this chapter in accordance with the type of account' at issue.").  So, even if Plaintiffs had identified a genuine dispute of material fact regarding breach, it appears their claims would also be barred by Alabama law.

DONE this 20th day of July, 2026.

                  /s/ Emily C. Marks
                 EMILY C. MARKS
                 UNITED STATES DISTRICT JUDGE